## J. B. BREWSTER & Co. v. TUTHILL SPRING Co. *et al.*

(*Circuit Court, N. D. Illinois.* April 30, 1888.)

1. SPECIFIC PERFORMANCE—REMEDY AT LAW.

Complainant, the owner of a patent for an improvement in carriage springs, made a contract with defendants, spring makers, by which defendants agreed to collect a certain royalty for each set of springs manufactured by them under complainant's patent, and sold to carriage manufacturers and dealers in carriage hardware, and to render quarterly accounts of such sales, and to permit complainant's agents to examine their books, a certain portion of the royalty to be paid to complainant. *Held,* that for a failure on the part of defendants to render accounts or to permit an examination of their books, complainant had an adequate remedy at law, and could, under Rev. St. U. S. § 724, compel a production of the books; and that specific performance would not be decreed.

2. SAME—MISTAKE—PATENT.

Complainant's patent, reissue of August 18, 1874, No. 6,018, was merely for the combination of a carriage spring with other elements, and not upon the manufacture of the spring itself; but the device was known in the market as the "Brewster Spring," and defendants supposed that the patent covered its manufacture, and there was evidence that complainant's agent so represented to them. Complainant knew of this mistaken impression on the part of defendants, but did not attempt to correct it, and the license was procured on the basis that defendants had no right to manufacture the springs without it. During the life of the contract other parties manufactured and sold the "Brewster Spring," without license or royalty, thereby injuring defendants' business, but complainant never took any legal steps to prevent such sales. *Held,* that complainant's conduct in obtaining the license, and in failing to protect its licensees, excluded it from the protection of a court of equity by specific performance.

In Equity. Bill for specific performance.

*Gifford & Brown, B. F. Thurston,* and *Jesse A. Baldwin,* for complainant.

*Judd, Ritchie, Esher & Judd,* for defendants.

BLODGETT, J. This is a bill in equity to compel a specific performance of a contract entered into between the complainant and the defendants F. H. Tuthill and W. H. Tuthill, and which it is claimed the defendant the Tuthill Spring Company is bound to perform and carry out as the successors of the individual defendants. It appears from the pleadings and proofs that the complainant, a corporation existing under the laws of the state of New York, is the owner of a patent granted to complainant, as assignee of Thomas H. Wood, on May 27, 1873, for "an improvement in carriage springs," which patent was reissued August 18, 1874, to complainant, as reissue No. 6,018. The patent in question is for a device for connecting the body of a buggy or light carriage with the side-bars by means of two transverse semi-elliptic springs, and the claim of the patent is in the following words: "The semi-elliptic springs, G, G, interposed between the side-bars, F, F, and the wagon body, all combined substantially as specified." It appears that after the patent in question was issued and placed before the public, buggies or light road wagons containing the device covered by this patent became popular, and quite an extensive demand was at once created for this class of ve-

hicles, which became known to the trade as the "Brewster Buggy;" and the springs in question became known as the "Brewster Springs;" so that manufacturers of springs adopted the practice of making springs adapted to the combination covered by this patent, with the shackles or clips by means of which the springs were attached to the side-bars; and these springs became known to the trade as the "Brewster Springs" and "Brewster Cross-Springs," and were kept in stock by dealers in carriage makers' supplies. The complainant issued licenses to a large number of manufacturers, authorizing the use of the patent in the construction of vehicles; but after a time complainant adopted a method, which seems to have been wholly unique and new at that time, of licensing spring makers to manufacture and sell springs adapted to use in the combination covered by this patent; the spring makers to collect from the carriage makers a royalty for the use of the complainants, in addition to their price for the springs as manufacturers; and also to accompany each set of springs sold for use in the combination covered by the patent with a plate with the word "patented" stamped thereon, and the date of the patent; the object of this arrangement being to make the spring makers collect for the complainant its royalties; and to the extent of the springs sold and royalties so collected to license the use of the patent. Among other spring makers to whom licenses of this character were issued, were the defendants F. H. and W. H. Tuthill, then doing business as manufacturers of springs in the city of Chicago, under the firm name of Tuthill & Co. This license, which bears date on the 7th of September, 1880, gives and grants to the firm of Tuthill & Co. a license to make and sell springs adapted to be used as shown and specified in this reissued patent, and provides that the licensees shall collect for each set of springs they shall sell to carriage or wagon manufacturers a royalty of five dollars for each set of springs; and for each set of springs sold by them to dealers in carriage hardware, a royalty of four dollars from the purchaser thereof; but they were not to collect any such royalties from purchasers who had been licensed by the complainant to use the said patented device. The licensees were bound by the terms of the license contract to keep a correct and separate account in a suitable book or books of all such springs—that is, the "Brewster springs"—that they should make or cause to be made; and also of all such springs which they should sell, or cause to be sold, with the names of the parties to whom they were sold; including those sold to parties holding licenses from complainant, which book or books should be at all suitable times open to the inspection of the complainant or his authorized agent, with authority to make copies thereof; and the licensees also agreed to render to the complainant, on the 1st days of January, April, July, and October, of each year, a correct account in writing of all said springs made by them during the preceding three months, of all said springs sold or caused to be sold by them during the three months preceding the rendition of said account, and also a correct account of the names of all the licensees to whom they had sold, or caused to be sold, any of said springs during the said period, and the number of sets of said springs so sold to each; the correctness of which report

and account was to be verified by the oath of some person having the best means of knowing the truth thereof.     And the said Tuthill & Co., as such licensees, were also within 10 days after the rendition of such account, to pay to complainant three dollars for each set of springs reported in said account as having been sold or caused to be sold by them, except those which had been sold to parties holding licenses from the complainant to use said patent.     The licensees were also to furnish the purchaser of each set of springs with a plate, which was to be provided by complainant, which should bear the following inscription, "Patented May 27, 1873."     It also appears that complainant has, since the making of this license, from time to time, reduced the amount of royalty to be charged and collected by the manufacturers for the use of said patented device; but the main features of the license have not been in any other respect materially modified.     It further appears that similar licenses were given by the complainant to about 20 other spring manufacturers in the United States; and that there are about 100 manufacturers of carriages and buggies licensed by the complainant, who, by the terms of the licenses given to Tuthill & Co. and to other spring makers, were to pay no royalty for the springs purchased by them.     It further appears from the pleadings and proof that in May, 1883, a corporation was organized known as the "Tuthill Spring Co.," and that since the organization of such corporation the said firm, and the individual members thereof, have ceased to do business as spring manufacturers, and said corporation has succeeded to the business formerly conducted by the firm, the said F. H. and W. H. Tuthill being the principal stockholders and business managers of said corporation; and that since the formation of said corporation it has manufactured and sold Brewster springs quite extensively. It also appears from the proof that the firm of Tuthill & Co. and the Tuthill Spring Company have sold a large number of these springs adapted for use in the patented combination, upon which they have failed to collect the royalties called for by the license, and have failed and refused to report, as called for by the terms of the license, the number of springs made and sold, and to whom sold, and to pay over the royalties collected on said springs; that neither said firm nor said company have made any reports of springs sold since October, 1884; and by their answer in this case the defendants say they have determined to pay no more royalty, and to render no more accounts for such springs.     It also appears that the defendants have refused to allow the agents of the complainant to inspect their books of account for the purpose of ascertaining the number of springs sold, and to whom sold, pursuant to the provisions of the contract.     The bill asks that the defendants, Tuthill & Co., and the Tuthill Spring Company, be compelled to specifically perform their said agreement to render on the 1st days of January, April, July, and October of each year correct accounts, as called for by their said license; and that the defendants be compelled to specifically perform all the provisions of said agreement, and to give complainant's agents the right to inspect their books which contain accounts of the sales of said springs, and to take copies thereof.

The defenses set up, briefly stated, are: (1) That equity has no jurisdiction in this case, because the complainant has a plain, adequate, and complete remedy at law; (2) that the license contract was obtained from the defendants Tuthill & Co. by fraud and misrepresentation; and ought not to be enforced in a court of equity; (3) that the patent in question is void for want of novelty; (4) that the reissued patent is void by reason of its expanded claim.

As to the first point made, that complainant has an adequate remedy at law, I can see no reason why the complainant in an action at law cannot recover all the damages for the breach of this contract that could be awarded by a court of equity, and could have action for successive breaches of the same; and by section 724 of the Revised Statutes complainant can compel the production of defendants' books to the same extent that this court can do sitting as a court of equity.

Upon the second point made by the defendant, that the contract was obtained from the defendant by fraud and misrepresentation, and hence ought not to be enforced in a court of equity, there is a conflict of testimony. The defendant William H. Tuthill, states in substance, that some time before the date of the license, a man purporting to be from J. B. Brewster & Co. called on him, and represented that it would be necessary for Tuthill & Co. to take a license from Brewster & Co., before the firm could manufacture "Brewster springs;" that at this time he, William H. Tuthill, was entirely ignorant of the scope and claims of the complainant's patent; that he knew there were springs in the market known as "Brewster Springs," but did not know, until he was so informed by complainant's agent, that it was necessary to have a license in order to manufacture them; and that at the time he applied for the license he was laboring under the impression or supposition that the complainant's patent covered the manufacture of the spring itself; and was also led to believe, from what was stated to him by complainant's agent, that complainant's patent was upon the spring, and not upon the combination of the spring with other elements. Mr. Tucker, the complainant's agent, who had the interview with W. H. Tuthill, testifies, in substance, that he told him that a license would be necessary in order to entitle them to manufacture the springs; but he did not tell young Tuthill that the patent was upon the spring. This is the substance of the testimony upon the question as to the circumstances under which the license was applied for; and, taking the allegations of the bill, and the statements of Mr. Tucker as to the fact that soon after the issue of this patent the springs used in the combination became known as "the Brewster Springs" or "Brewster Cross-Springs," and were dealt in by dealers in carriage makers' hardware and supplies and others, by that name. I have no doubt that the impression on young Tuthill's mind, at the time he was called upon by Mr. Tucker, was that the patent was upon the springs. This was a natural impression from the manner in which the springs were spoken of in the trade and business; and, if Mr. Tucker did not actually tell Mr. Tuthill that the patent was upon the springs themselves, I have no idea that he attempted to disabuse his mind of the erroneous impression he had upon

that subject, but allowed him to remain under the supposition that the patent was upon the springs. While the circumstances were such that Mr. Tucker ought, as complainant's agent, to have frankly informed Tuthill & Co. that the springs were not patented alone or by themselves, but that complainant had adopted the plan of licensing spring makers as the easiest method of collecting its own royalties, and then left them at liberty to decide whether they would take a license or not. The complainant, as the owner of this patent, had adopted a novel expedient or attempt to make the spring makers its agents for the introduction of its patents, and the collection of its royalties, acting probably under the advice that manufacturers of these springs adapted to be used in the patented combination were contributory infringers of the patent, if they did so without license. The agent or agents of the complainant would naturally claim to a spring manufacturer that such spring maker had no right to make and sell the "Brewster Springs," as they were known, without a license from complainant; and the natural inference of any person untrained in the technicalities of the patent law, or the peculiar procedure of the complainant with reference to this patent, would be that the patent was upon the springs themselves. Hence, I have no doubt that this license was taken by the firm of Tuthill & Co. under the impression that the patent was upon the springs, and that they could not manufacture them without a license from the complainant. This firm was just starting in business, and was undoubtedly desirous of manufacturing any and all articles in their line for which there was a demand, and also cautious about getting into trouble by infringing any one's patent, and for these reasons this junior member of the firm was easily persuaded to take a license, the sole terms of which were dictated by complainant; and these terms, if lived up to and enforced, if not in themselves inequitable and unjust, are, to say the least, embarrassing to the licensee, as they virtually make the licensee admit that he is a contributory infringer of complainant's patent by making and selling these springs; leaving the field open for bolder men, who refuse to take a license to make springs, and sell them to whoever will buy them; and to contest not only the question of contributory infringement, but also the validity of the patent itself. The complainant has instituted no prosecution which has been brought to trial, and apparently has sought to force no prosecution to trial against these manufacturers on the ground of their being contributory infringers of its patent; so that, in effect, the market for cross-springs of this character has been supplied mainly by manufacturers who have taken no licenses from the complainant, and were free to sell to whoever they saw fit, making their own price merely as manufacturers, and with no royalty or patent fee added. That this conduct on the part of complainant has had the effect to interfere with the business of the firm of Tuthill & Co. and the Tuthill Spring Company, is clearly shown by the proof; and it would seem that every dictate of justice and fair dealing required that this complainant should protect its licensees if it expected them to live up to the terms of their licenses; and, not having done so, I am of the opinion that the conduct of the complainant in obtaining this license

under what in effect amounted to a false statement as to the scope of the patent, and the conduct of the complainant since the license was obtained, in not protecting its licensees, is such as to exclude the complainant from the protection of a court of equity by the specific enforcement of this contract. Complainant has put defendants in such relations to it under this license that every dictate of fair dealing required that they should not only establish and maintain the validity of the patent as against those who used the entire combination, but also that they sustain by judicial proceedings the position on which they exacted this license from defendants, viz., that all who made and sold springs adapted and fitted for use in the combination were infringers, and thus have protected the defendants in the manufacture of the springs; and this complainant has wholly failed to do. The law is well settled and elementary that where a contract is harsh and oppressive, or where it has been obtained by fraud, or where even one party has executed it under a mistaken impression of its scope and provisions, a court of equity will not interfere to specifically enforce it, but will leave the complainant to his remedy at law. 2 Story, Eq. Jur. §§ 693, 769, 770; Bigelow, Fraud, 390, 391; Adams, Eq. 83; *Race* v. *Weston*, 86 Ill. 94. I am, therefore, of opinion that upon this second ground, if not upon the first, the complainant is entitled to no relief in this court.

The third and fourth points made by the defendants, which challenge the validity of the patent for want of novelty, and by reason of the reissue with expanded claims, while not necessary for consideration in the view I take of the case upon the other points made, may, I think, be so far considered as to say that the defendants have put into the record a large amount of proof bearing upon these questions; and in my estimation. this proof could never have been considered by the court, because, if this contract was binding upon the defendant, and could be enforced in this court, I have no doubt the defendants were estopped from denying the validity of the patent from any cause; and hence, while dismissing this bill for want of equity, it will be with the provision that the defendants pay their own costs, as the bulk of the costs on the part of defendants has been made by taking proof upon these two latter points.